**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

SADIQ MOHAMMAD,

      Plaintiff,

v.

YORK SPACE SYSTEMS LLC, a Colorado corporation;
SHANE MEAKIM, an individual; and
MARIE LEHNERER, an individual,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

## I.      INTRODUCTION

This case centers on the enduring repercussions of racial discrimination in the workplace and an unjust termination fueled by outdated racial, ethnic, and xenophobic stereotypes. Plaintiff Sadiq Mohammad, a diligent employee with an impeccable record at York Space Systems ("YSS"), faced severe discrimination and was wrongfully terminated. Despite Mr. Mohammad's unwavering commitment and significant contributions to YSS, his tenure was plagued by persistent discrimination orchestrated by his manager, Shane Meakim, and enabled by YSS's leadership. Manager Meakim targeted Mr. Mohammad relentlessly because of his Pakistani background, and when Mr. Mohammad bravely spoke out against the hostile work environment, he faced increased hostility and retaliation from YSS management. Despite receiving multiple complaints from Mr. Mohammad detailing Manager Meakim's abhorrent behavior, which

included use of racial slurs and other deliberately offensive acts, and physical threats, YSS willfully turned a blind eye. Instead of addressing the hostile work environment created by Manager Meakim, YSS retaliated against Mr. Mohammad accusing Mr. Mohammed of "mishearing" the comments because of his hearing impairment, and eventually terminated him. This case exposes the deep-seated pattern of discrimination and retaliation within YSS and demands accountability and reform within the organization to ensure that such injustices are rectified and prevented in the future.

## JURISDICTION, VENUE, AND PARTIES

1. This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* as amended by Title I of the Civil Rights Act of 1991.

2. Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b).

3. YSS's principal place of business is located in Colorado and a substantial part of the events of omissions giving rise to this claim, including the unlawful employment practices alleged herein, occurred in this district.

4. At all relevant times material to this Complaint, Mr. Mohammad is a citizen of the United States and a resident of the State of Colorado.

5. Defendant YSS is a Colorado corporation with a principal place of business at 6060 S. Willow Drive, Greenwood Village, Colorado 80111.

6. During the relevant time period, YSS met the definition of "employer" under all relevant statutes.

2

7.      YSS is a government contractor, which is subject to the provisions of 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964. As such, YSS must comply with the federal, state, and local laws prohibiting employers from discriminating against employees in hiring, promotion, compensation, discharge, and other terms and conditions of employment, based on factors including but not limited to, the employee's race, ethnicity, national origin, ancestry, and disability.

8.      At all relevant times, Defendant Marie Lehnerer was the Human Resources Director at YSS. Defendant Lehnerer is a citizen of the United States and a resident of the State of Colorado.

9.      At all relevant times, Defendant Shane Meakim was a Manager as YSS. Defendant Meakim is a citizen of the United States and a resident of the State of Colorado.

## ADMINISTRATIVE EXHAUSTION

10.      Mr. Mohammad filed an inquiry with the Equal Employment Opportunity Commission ("EEOC") on September 4, 2023, filing number 541-2023-04225.

11.      Mr. Mohammad filed a charge on March 11, 2024.

12.      The Charges of Discrimination include allegations of race, religion, national origin, disability, and retaliation.

13.      The EEOC issued a notice of right to sue on May 20, 2024.

14.      Plaintiff has filed this lawsuit less than 90 days following issuance of the notice of right to sue.

## FACTUAL ALLEGATIONS

### Mr. Mohammad Performed Competent and Satisfactory Work at YSS

3

15.  Originally from Pakistan[1], Mr. Mohammad relocated to the United States in 1999.

16.  Mr. Mohammad is hearing impaired, a condition which began after his arrival in the United States.

17.  Despite undergoing multiple procedures and surgery to address the hearing loss, Mr. Mohammad was informed that he would eventually become 90% deaf in both ears.

18.  Since the onset of his hearing loss in 1999, Mr. Mohammad has relied on hearing aids in both ears, which he continues to wear.

19.  In March 2022, Mr. Mohammad applied for the position of Enterprise Resource Planning (ERP) System Administrator with YSS.

20.  Mr. Mohammad's position was responsible for analyzing business requirements to drive the design and implementation of new business processes including ERP and associated systems configuration, develop business strategies and critical path activities to troubleshoot and solve problems, and coordinate with related teams or departments to ensure the business runs efficiently.

21.  YSS is a Denver based aerospace manufacturing company that specializes in developing and manufacturing advanced aerospace systems for various applications, including fulfilling defense contracts with the United States government.

22.  After applying for the position, Mr. Mohammad underwent multiple rounds of interviews over a three-month period and was ultimately offered the job.

23.  Mr. Mohammad relocated from Chicago, Illinois, to Denver, Colorado to join YSS

---

[1] The US Census Bureau categorizes Pakistani under the racial category of Asian, which includes people with origins in the Indian subcontinent, Southeast Asia, and the Far East.

in August of 2022.

24.     Upon starting his employment at YSS, Mr. Mohammad provided Human Resources ("HR") with a doctor's note outlining his progressive hearing loss.

25.     Mr. Mohammad also provided YSS with the results of an audio test from DuPage Medical Group, as requested by YSS.

26.     Between August 8, 2022, and April 30, 2023, Mr. Mohammad worked under YSS manager Geoffrey Rabinowitz.

27.     From May 2023 to July 9, 2023, Mr. Mohammad worked under manager Cliff Ferrero.

28.     Throughout the eleven months working under Messrs. Rabinowitz and Ferrero, Mr. Mohammad was happy at YSS. He found satisfaction in his role and earned positive feedback for his performance.

### Manager Meakim Verbally and Physically Harasses Plaintiff

29.     On July 10, 2023, YSS hired Shane Meakim who took over as Mr. Mohammad's direct manager.

30.     Defendant Meakim's desk was directly across from Mr. Mohammad's, with both of them facing each other.



31.     On the first day of his hire, as Defendant Meakim approached his own desk, Mr. Mohammad said hello and introduced himself to his new manager.

32.     Defendant Meakim ignored Mr. Mohammad's greeting and instead asked him where he was from.

33.     Mr. Mohammad shared that he was originally from Pakistan.

34.     In response, Defendant Meakim said, "Oh, you are Paki."

35.     This comment upset and offended Mr. Mohammad.

36.     Mr. Mohammad explained to Defendant Meakim that "Paki" is a racist slur similar to using the "n-word."

37.     Defendant Meakim acknowledged that he was aware of the offensive nature of the term and said, "yeah I know."

38.     Following this exchange, Defendant Meakim asked Mr. Mohammad if he was on an H1 visa.

39.     YSS, as a defense contractor, limits its hiring to U.S. citizens.

40.     Mr. Mohammad confirmed that he was not in the United States on an H1 visa and

was indeed a U.S. citizen.

41.    Defendant Meakim persisted and inquired about how Mr. Mohammad had managed to convert his H1 visa to a green card to become a U.S. citizen.

42.    Mr. Mohammad, who has never held an H1 visa, did not respond.

43.    A few moments later, Defendant Meakim again asked Mr. Mohammad how he became a U.S. citizen.

44.    When Mr. Mohammad did not respond, Defendant Meakim persisted, asking, "How did you get a job here, Sadiq Paki?"

45.    Mr. Mohammad replied, "Same as you, I applied for it."

46.    Defendant Meakim commented, "You guys from India and Pakistan get free education back home, then you come here and take over our jobs. No need to take student loans or pay back anything and here it takes our children years to pay back their loans."

47.    Mr. Mohammad stated, "The company hires based on qualifications. No one here is my relative."

48.    Defendant Meakim continued commenting on the matter, but Mr. Mohammad pointedly did not respond to his additional inquiries or statements.

49.    The next day, on Tuesday, while working at his desk, Defendant Meakim asked Mr. Mohammad a question.

50.    Because Defendant Meakim spoke softly, Mr. Mohammad did not hear the question and walked around to Defendant Meakim's chair so that he could hear him better.

51.    Defendant Meakim stood up, and while the two were talking, Defendant Meakim sneezed in Mr. Mohammad's direction, without covering his mouth. Defendant Meakim did not

attempt to turn his head away from Mr. Mohammad or apologize for it.

52.    Respiratory droplets landed on Mr. Mohammad's face.

53.    Mr. Mohammad immediately stepped back in shock and walked away to go to the bathroom to wash his hands and clean up.

54.    Defendant Meakim did not apologize or say anything to acknowledge what he had just done.

55.    On the third day of Defendant Meakim's employment with YSS, Mr. Mohammad approached Mr. Ferrero, his former manager and the Senior Director of Production, and informed him about Defendant Meakim's inquiries into his visa and citizenship status and the incident of Defendant Meakim sneezing in his face.

56.    Mr. Ferrero advised Mr. Mohammad to be patient with Defendant Meakim and give him time to adjust at YSS.

57.    Mr. Ferrero suggested that there might be a misunderstanding, possibly related to Mr. Mohammad's use of hearing aids.

58.    Mr. Mohammad stated that he heard Mr. Meakim's comments about his nationality and visa clearly, and at any rate, no misunderstanding justified Defendant Meakim sneezing in his face.

59.    Mr. Ferrero did not offer any additional solutions to Mr. Mohammad.

60.    Later that day, while working at his desk, Defendant Meakim once again directed a question at Mr. Mohammad, speaking very softly.

61.    Mr. Mohammad asked him to repeat himself.

62.    In response, Defendant Meakim said, "You aren't listening to me."

63.    Mr. Mohammad explained that Defendant Meakim needed to speak louder because Mr. Mohammad was using hearing aids and could not hear individuals if they did not speak at a normal volume.

64.    Defendant Meakim walked over to Mr. Mohammad's desk and stood to his left side while Mr. Mohammad stayed seated and brought up a work-related issue pertaining to his log-in.

65.    As Mr. Mohammad brought up the information on his laptop in response to Defendant Meakim's inquiry, Defendant Meakim sneezed again without turning his head or covering his mouth.

66.    Droplets landed on the screen and on Mr. Mohammad's hand.

67.    Perplexed by the repetition of such behavior, Mr. Mohammad felt growing discomfort and heightened concern about his health and safety. This was particularly significant in the context of a post-COVID world, given that Mr. Mohammad's wife is immunocompromised and therefore at higher risk of severe illness if exposed to COVID-19.

68.    Mr. Mohammad immediately went to the bathroom to clean himself up.

69.    After returning from the bathroom, Mr. Mohammad confronted Defendant Meakim and told him that his actions were not only socially inappropriate but also violated YSS's COVID protocols. He emphasized that COVID-19 was still a concern and, as a diabetic, Defendant Meakim's actions posed a significant risk to him.

70.    Later that day, Defendant Meakim brought up the topic of student loans to Mr. Mohammad, complaining that it takes Americans years to pay off their childrens' student loans.

71.    Defendant Meakim then angrily stated, "Indies and Pakis are taking all of our jobs."

72.    Mr. Mohammad explained that he had gone through four different interviews

before being hired by YSS, emphasizing the difficulty he faced in securing the job.

73. When Defendant Meakim started to respond, Mr. Mohammad interrupted him, stating, "I don't want to talk about this, and please don't use the term 'Paki' - it is offensive and a racial slur."

74. The following day, Defendant Meakim resumed his interrogation into Mr. Mohammad's citizenship, notwithstanding Mr. Mohammed's earlier obvious hesitation and discomfort, asking him, "How did you get US citizenship Sadiq Paki and who sponsored you?"

75. Mr. Mohammad objected, stating, "This is not your responsibility to know. If you want the number of USCIS, I can give it to you, and you can ask them."

76. Defendant Meakim's continued badgering of Mr. Mohammad regarding his immigration status and his constant use of the term "Sadiq Paki" to refer to him were starting to make Mr. Mohammad anxious and distressed.

77. Mr. Mohammad approached Cynthia Griggs, the office manager, and asked if he could move his desk elsewhere in the office.

78. Mr. Mohammad provided an excuse about the sun bothering his eyes.

79. Cynthia suggested adjusting the blinds, but when Mr. Mohammad insisted, she mentioned that she would inquire with Angelina Smith, the Vice President at YSS.

80. Later that day Cynthia informed Mr. Mohammad that VP Smith had denied his request to move his desk.

**Unable to Tolerate Defendant Meakim's Behavior, Mr. Mohammad Complains about Experiencing Workplace Harassment and Discrimination to Management.**

81. In the office kitchen that day, while making his coffee, Mr. Mohammad saw Marie Lehnerer, the YSS Human Resources Director, and shared with her Defendant Meakim's

10

inquisition into his visa status and citizenship, the incidents regarding Defendant Meakim sneezing in his face and direction, and Defendant Meakim's use of racial slurs.

82.    Director Lehnerer responded, "Maybe you aren't used to working with someone, and some people just have a hard time pronouncing Pakistan, so they shorten it. It doesn't mean they are using a slur word against you."

83.    Mr. Mohammad had an upcoming vacation scheduled for the following week and he hoped that upon his return, the situation would improve.

84.    Upon returning from vacation, Mr. Mohammad spoke to Jimmy Adams, the financial controller at YSS. Mr. Adams informed Mr. Mohammad that Defendant Meakim was granting full administrative access to too many individuals who were non-technical end-users. He expressed concerns to Mr. Mohammad about financial information being shared too widely by Defendant Meakim.

85.    When Mr. Mohammad relayed Mr. Adams' concerns to Defendant Meakim, Defendant Meakim responded angrily, asserting that he [Meakim] was an ERP Manager with the authority to grant full admin access to anyone and Mr. Mohammad had no right to dictate his actions.

86.    Defendant Meakim warned Mr. Mohammad not to provoke him, stating, "Do not make me mad because I am a 'madman.'"

87.    On July 27, 2023, Mr. Mohammad emailed VP Smith, requesting a meeting.

88.    Mr. Mohammad met with VP Smith and HR Director Lehnerer the following day.

89.    During the meeting, Mr. Mohammad relayed his concerns about Defendant Meakim's use of the slur "Paki," aggressive questioning about his visa and citizenship status, the

11

offensive sneezing, and his apprehension and fear after Defendant Meakim referred to himself as a "madman."

90.    VP Smith did not offer any suggestions, intervention, or solutions, nor did she express any concern or commitment to address the problems with Manager Meakim.

91.    HR Director Lehnerer did not contribute to the conversation.

92.    No one offered to investigate Mr. Mohammad's complaints about racist, ethnic, and xenophobic epithets by his manager.

93.    When Mr. Mohammad asked if he could move his desk due to Defendant Meakim's harassment, VP Smith informed him that it would not be possible to do so.

94.    A few days after the meeting, rather than addressing the concerns raised by Mr. Mohammad against Defendant Meakim, HR Director Lehnerer asked Mr. Mohammad to undergo an audio test for his hearing and promptly submit the results to her.

95.    This action by Director Lehnerer dismissed Mr. Mohammad's complaints against Defendant Meakim by writing off the slurs and interrogations as no more than a byproduct of his medical hearing condition.

96.    In the days following the meeting, Defendant Meakim's behavior towards Mr. Mohammad became even more aggressive.

**Defendant Meakim Intentionally Creates Work-Performance Problems for Mr. Mohammad on Account of his Race, National Origin, and Disability**

97.    The following week, Defendant Meakim systematically excluded Mr. Mohammad from all meetings, including previously scheduled ones such as department meetings, vendor meetings, and internal meetings, resulting in a complete blackout of information for Mr. Mohammad.

98.    This exclusion left Mr. Mohammad, in his role as an ERP System Administrator, uninformed about crucial developments.

99.    This was particularly problematic because Mr. Mohammad's position required coordinating with teams and departments to gather feedback on system design and efficiency.

100.    Additionally, Defendant Meakim started redirecting Mr. Mohammad's workload to third-party vendors, initiating the outsourcing of his responsibilities to non-IT internal users, and Blytheco and EWA, two consulting firms that YSS worked with.

101.    Defendant Meakim did this because he did not believe employees with Indian or Pakistani origins should have jobs in the United States.

102.    In an attempt to frustrate Mr. Mohammad and get him to quit, Defendant Meakim frequently altered project requirements either midway through development or just before project delivery.

103.    Defendant Meakim consistently imposed impossible project completion dates and then used Mr. Mahammad's inability to meet them to threaten outsourcing.

104.    Defendant Meakim assigned Mr. Mohammad priorities only to change them part way through, resulting in opportunities for Defendant Meakim to berate Mr. Mohammad for working on prior assignments.

105.    Defendant Meakim's continuous manipulation of work tasks and outsourcing threats was intentional and a deliberate effort to create a hostile work environment and to manufacture performance issues for Mr. Mohammad.

106.    This persistent situation induced mental stress for Mr. Mohammad.

107.    Adding to the existing challenges, Defendant Meakim refused to authorize the

13

purchase of software and other necessary tools that Mr. Mohammad needed to complete his tasks.

108.    During a pre-scheduled meeting between Mr. Mohammad and Defendant Meakim on August 15, 2023, Mr. Mohammad objected to his treatment.

109.    Defendant Meakim responded by threateningly moving towards Mr. Mohammad, pointing his two right-hand fingers very close to Mr. Mohammad's eyes, and stating, "look at my face when I'm talking to you. Don't make me upset, I'm a madman. Don't forget I know where you live."

110.    This was the second time Defendant Meakim had called himself a "madman" to Mr. Mohammad.

111.    Defendant Meakim's reference to himself as a "madman" deeply alarmed Mr. Mohammad.

112.    Given Defendant Meakim's previously expressed negative views towards South Asian immigrants, apparent animosity towards individuals of Pakistani descent, aggressive body gestures, and the self-labeling as a "madman," together felt like a physical threat, intensifying Mr. Mohammad's fear of Defendant Meakim.

## HR Dismisses Mr. Mohammad's Complaints Labeling them as Mere "Misunderstandings" Caused by his Disability

113.    On August 20, Mr. Mohammad submitted a comprehensive written complaint to VP Smith and HR Director Lehnerer, detailing the specific concerns and issues he was experiencing due to Defendant Meakim's actions.

114.    Mr. Mohammad described several instances of discrimination against him by Manager Meakim based on his disability, as well as feelings of isolation, the delegation and outsourcing of his tasks to third-party vendors, concerns about racism, and Defendant Meakim's

self-identification as a "madman." He also expressed his fear of potential physical attacks and highlighted the following concerns:

- Manager Meakim's "mental bullying, abrasive behavior, harass[ment] … and discrimination."

- Manager Meakim's self-identification as a "madman," which instilled fear in Mr. Mohammad of potential harm.

- Mr. Mohammad feeling harassed due to Manager Meakim's words and behavior.

- The mental distress and fear Mr. Mohammad experienced from continuing to work with Manager Meakim, with suspicions that Manager Meakim's behavior stemmed from either racism or a troubled mental state.

- Mr. Mohammad's observation that everyone at YSS was generally positive and respectful, except for Manager Meakim, who did not meet these standards.

- Manager Meakim sneezing in Mr. Mohammad's face without covering his nose or mouth.

- Manager Meakim altering the task or project scope after Mr. Mohammad had completed it.

- Mr. Mohammad's fear of retaliation, acknowledging that those who file complaints against their managers often lose their jobs but feeling compelled to "speak out."

115. After Mr. Mohammad sent out the email, HR Director Lehnerer approached Mr. Mohammad's desk and angrily demanded to know why he had submitted a written complaint when she was already addressing the issue.

116. Mr. Mohammad explained that it had been almost three weeks since his meeting with her and VP Smith and Defendant Meakim's mistreatment had only escalated and no one at YSS had intervened or made any effort to protect him.

117. Mr. Mohammad expressed that he was feeling stress and anxiety about working

with Defendant Meakim and mentioned having recordings on the company phone where Defendant Meakim referred to him as "Paki."

118.    HR Director Lehnerer did not respond and left to go back to her office.

119.    Upon checking his company phone later, Mr. Mohammad discovered that his recording of Defendant Meakim had been deleted, and his privileges to access saved recordings on the company phone had been revoked.

120.    Thereafter, everyone at YSS ceased communicating with Mr. Mohammed.

121.    When Mr. Mohammad asked Olivia Kingsbury, the Inventory Accountant, about why she stopped giving Mr. Mohammad system feedback, she told him that Defendant Meakim had instructed individuals not to go to Mr. Mohammad directly or provide him with feedback and to consult with Defendant Meakim instead.

122.    Accounting Manager, William Abele, disclosed that Defendant Meakim had communicated to Accounting Controller Adams that all communication should route through Defendant Meakim rather than directly to Mr. Mohammad.

123.    Defendant Meakim consistently interrupted Mr. Mohammad's conversations with other employees by actively inserting himself in every interaction Mr. Mohammad had with others.

124.    When Mr. Mohammad confronted Defendant Meakim about this, Defendant Meakim responded by saying, "I do not want anyone to come to you or to Dev Rudra as a requester."

125.    Tellingly, Dev Rudra was of South Asian descent and had also immigrated to the United States before becoming a United States citizen.

126.    The more Mr. Mohammad voiced his concerns, the more YSS blamed him for not

16

being able to get along with Defendant Meakim.

127.    Mr. Mohammad sent CEO Dirk Wallinger an email regarding the issue:

Hi Dirk,

In my 8/20 email to HR I was told HR that Shane Meakim completely isolated, today (Monday) I asked Williams Abele you was supposed to give me report development work, he answered me Shane Meakim told Jimmy Adams do not contact to Sadiq for any needs.
Shane Meakim completely stopped assigning me any jira tickets almost for month for now.

Please verify with Jimmy Adams or Williams if this truth or not because I was never verified.

128.    On August 29, Defendant Meakim asked Mr. Mohammad why a specific project hadn't been completed yet.

129.    Mr. Mohammad explained that because Defendant Meakim was constantly changing priority deadlines, he had a difficult time following through on one project.

130.    Mr. Mohammad told Defendant Meakim that moving forward, if Defendant Meakim wanted to change priority deadlines on projects, he needed to submit the change via email to avoid any miscommunication.

131.    Thus far, Defendant Meakim had been issuing verbal directives, which he could later deny. Even if Defendant Meakim made the change on a priority sheet established for the task of tracking assignments, there was no way to tell when the priority was altered and what it was previously.

132.    To address this, Mr. Mohammad emphasized that Defendant Meakim send an email when he wanted to make changes to priority dates/deadlines on a project so there would be clarity and a paper trail.

133.    This suggestion upset Defendant Meakim, prompting him to order Mr. Mohammad

17

into a meeting room.

134.    Upon entering the room with Mr. Mohammad, Defendant Meakim started yelling and exclaimed, "I will change whatever I want."

135.    In response, Mr. Mohammad explained that Defendant Meakim's actions were causing issues for him, to which Defendant Meakim retorted, "You can't do anything about it, go complain and see what happens. No one is going to help you."

136.    Defendant Meakim continued making threats, telling Mr. Mohammad, "Go ahead and file complaints against me and see what happens, you don't know me."

137.    Following this encounter, Mr. Mohammad left the room and sent two emails.

138.    The first email was sent at 2:14 p.m. to VP Smith and HR Director Lehnerer and stated: "Please help me and protect from Shane harassing."

139.    The second email was sent at 2:19 pm to the same recipients as the first and stated: "Shane is giving mentality pain through his wording, typing. Please help me. During the one year of my working with YSS never ever seen this which seeing now. I'm going back to home now because need some rest."

140.    After not receiving responses to his two emails, Mr. Mohammad stopped by VP Smith's office on his way out of the office.

141.    However, VP Smith directed him to talk to HR Director Lehnerer.

142.    Mr. Mohammad went to HR Director Lehnerer's office and attempted to explain his concerns, but she interrupted him, stating that she needed to discuss the matter with CEO Dirk Wallinger and devise a plan for Mr. Mohammad to continue working with Defendant Meakim.

143.    Despite Mr. Mohammad expressing feeling discriminated against by Defendant

Meakim, HR Director Lehnerer cut him off again, promising to talk to him after consulting with CEO Wallinger.

144.    Mr. Mohammad urged her to consider assigning him to work under a different manager and then left her office.

145.    In later meetings with HR Director Lehnerer, when Mr. Mohammad expressed fear of Defendant Meakim due to Defendant Meakim calling himself a "madman," she laughed and dismissed it as a joke -  asserting that Defendant Meakim didn't mean anything by it and that Defendant Meakim was not a danger and posed no threat to Mr. Mohammad.

146.    HR Director Lehnerer claimed that the verbal harassment complained about by Mr. Mohammad had not occurred and that it was all just a result of Mr. Mohammad's deafness which caused misunderstandings, suggesting that Mr. Mohammad was somehow misinterpreting racist slurs and interrogations of his citizenship status.

147.    Upon Mr. Mohammad expressing concerns about Defendant Meakim repeatedly threatening to outsource his job tasks to Blytheco, HR Director Lehnerer not only asserted that such threats were allowed but went as far as to state that she herself engages in similar practices with employees under her supervision.

148.    HR Director Lehnerer told Mr. Mohammad that there was no discrimination and that he needed to figure out a way to work under Defendant Meakim.

### Mr. Mohammad Communicates with the EEOC and is Retaliated Against

149.    On September 4, 2023, Mr. Mohammad submitted an inquiry with the Equal

Employment Opportunity Commission ("EEOC").[2]

150.    Mr. Mohammad not only experienced emotional fatigue and anxiety due to Defendant Meakim's hostility and bullying but also began feeling unheard and unsupported in his efforts to address the behavior.

151.    Hoping to encourage HR Director Lehnerer to take his concerns seriously, Mr. Mohammad printed the acknowledgment email from the EEOC and showed it to her, telling her he had filed a charge with the EEOC.

152.    A few days later Defendant Meakim and HR Director Lehnerer met with Mr. Mohammad.

153.    They both told Mr. Mohammad that his perception of discrimination was the result of a misunderstanding between himself and Defendant Meakim, and the only way to resolve the issues would be for him to retract his August 8th complaint to HR and his charge with the EEOC.

154.    When Mr. Mohammad said he would not be withdrawing the charge, Defendant Meakim shook his head and said, "You Paki" and then left the room.

155.    HR Director Lehnerer heard the remark but did not say anything.

156.    On September 7, Defendant Meakim took Mr. Mohammad to a meeting room and showed him a job description and told him he would be hiring a new system analyst.

157.    Defendant Meakim asked Mr. Mohammad if he wished to continue working at YSS.

158.    When Mr. Mohammad responded that he still wanted to work at YSS, Defendant

---

[2] Mr. Mohammad believed he had filed a charge with the EEOC. In his communication with HR Director Lehnerer, he informed her that a charge had been filed.

20

Meakim demanded that he retract his complaint to VP Smith and HR Director Lehnerer dated August 20, 2023, as well as the EEOC charge.

159.    In anger, Defendant Meakim moved closer to Mr. Mohammad, brought his two fingers close to Mr. Mohammad's eyes, and stated, "you are lucky Cliff gave you your review."

160.    This encounter heightened Mr. Mohammad's fear of Defendant Meakim, leading him to decide that he would no longer meet with Defendant Meakim alone in an office again.

161.    In the subsequent days, Defendant Meakim and HR Director Lehnerer consistently threatened Mr. Mohammad in connection with his EEOC charge.

162.    Notably, after being hired, Mr. Mohammad had shared with Mr. Rabinowitz and Mr. Ferrero that his wife suffered from serious medical issues. He had specifically requested from Messrs. Rabinowitz and Ferrero that he be allowed to keep his personal phone on during meetings and requested the flexibility to go home in case of an emergency call from the hospital or home.

163.    This information was also shared with HR, with only Mr. Rabinowitz, Mr. Ferrero, and HR Director Lehnerer being privy to the details of his wife's medical problems.

164.    However, HR Director Lehnerer exploited Mr. Mohammad's personal circumstances, leveraging his wife's medical issues to threaten him into withdrawing his discrimination complaints.

165.    In one specific instance, HR Director Lehnerer approached Mr. Mohammad's desk and questioned how he expected to manage his mortgage payments or provide medical treatment for his wife if he were to lose his job.

166.    Mr. Mohammad, logically, took this as a threat that he needed to rescind his complaints of discrimination, or he would be terminated.

167.    HR Director Lehnerer blamed Mr. Mohammad as the source of the problem, insisting that Defendant Meakim was not engaging in discrimination, that he was not creating a hostile work environment for Mr. Mohammad, and that Mr. Mohammad just needed to figure out a way to work with him because Defendant Meakim was the boss.

168.    Notably, during meetings, Defendant Meakim barred Mr. Mohammad from having his personal phone on him, contradicting the previously agreed upon accommodation. When Mr. Mohammad raised this concern with HR Director Lehnerer, she dismissed it, stating, "nothing is going to happen if your phone is not with you."

### YSS Compels Mr. Mohammad to Continue Working with his Harasser and When Mr. Mohammad Refuses, He is Terminated

169.    On September 26, 2023, HR Director Lehnerer scheduled a meeting between herself, Mr. Mohammad, and Defendant Meakim.

170.    HR Director Lehnerer sent an email outlining ERP Objectives and Goals, detailing Mr. Mohammad's short-term and long-term work projects. The document reduced all his complaints of discrimination, harassment, and threatening behavior against Defendant Meakim as "misunderstandings."

171.    The document emphasized, "… your supervisor is Shane Meakim" and dictated weekly meetups between Mr. Mohammad, Defendant Meakim, and Ms. Lehnerer.

172.    The document failed to address any of Mr. Mohammad's actual concerns about discriminatory and retaliatory harassment perpetuated by Defendant Meakim.

173.    In fact, the prospect of the now obligatory weekly meetings raised even greater concerns for Mr. Mohammad, as both Defendants Meakim and Lehnerer were sources of anxiety for him.

174. Over the past two months, Mr. Mohammad had learned that verbal communication with Defendant Meakim was futile.

175. Mr. Mohammad preferred communication through email, allowing him to reference the discussed matters so that Defendant Meakim could not deny them later.

176. It was for this very reason that he had previously asked Defendant Meakim to issue all directives via email/ in writing.

177. Despite the fact that his concerns were being ignored, Mr. Mohammad reluctantly agreed to attend the meeting requested by HR Director Lehnerer.

178. However, Mr. Mohammad had a commitment to leave the office by 1:00 pm that day for his wife's doctor's appointment, which he had communicated to HR Director Lehnerer via email. She agreed to set the meeting for the next day.

179. Subsequently, on September 27 and 28, Mr. Mohammad did not feel well enough to come to the office and emailed Defendant Meakim to notify him that he would be working from home.

180. Mr. Mohammad emailed CEO Wallinger and Ms. Palko as a last resort to explain his concerns with The ERP Objectives and Goals document.

181. In the email, Mr. Mohammad also conveyed that his work situation was adversely affecting his health, prompting him to work from home on that particular day.

182. Instead of addressing his concerns, on September 28, HR Director Lehnerer emailed Mr. Mohammad notification of his termination, citing in a letter his alleged refusal to meet with Defendant Meakim and his failure to "engage in required discussions."

183. The letter stated that Mr. Mohammad was being terminated for his "unwillingness

to cooperate with the Company's efforts to address this matter appropriately."

184.    YSS never showed any inclination to sincerely investigate or genuinely respond to Mr. Mohammad's concerns or resolve them. Rather, after every time he raised concerns, and finally, after being informed that Mr. Mohammad filed an EEOC charge, YSS retaliated against and ultimately terminated Mr. Mohammad in violation of his federally protected rights to be free from racial, ethnic, national origin, and disability discrimination.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**42 U.S.C. § 1981 *et seq*.**
**Discrimination and Hostile Work Environment on Basis of Race, Ethnicity, and Ancestry**
**(Against All Defendants)**

185.    Plaintiff hereby incorporates all other paragraphs of this complaint as if fully set forth herein.

186.    Section 1981 prohibits discrimination in the making and enforcement of contracts and is designed to include a remedy against discrimination in employment on the basis of race, ethnicity, and/or ancestral characteristics.

187.    Under Section 1981 all persons have the same right to make and enforce contracts and to enjoy full and equal benefit of all laws.

188.    Employment contracts are among those contracts protected by Section 1981.

189.    Plaintiff was born in Pakistan and is racially classified as Asian.

190.    Plaintiff is a member of a racial minority and therefore a protected class under

42 U.S.C. § 1981.[3]

191.    Defendants discriminated against Plaintiff in violation of 42 U.S.C. § 1981 based on his race, ethnicity, and/or ancestral characteristics.

192.    But for Plaintiff's race, ethnicity, and/or ancestral characteristics, he would not have been subjected to the unlawful employment practices complained of above.

193.    Defendants by and through the conduct of its employees and agents unlawfully denied Plaintiff the benefits, privileges, and terms and conditions of his employment due to his race, ethnicity, and/or ancestral characteristics.

194.    Defendants additionally discriminated against Plaintiff in violation of 42 U.S.C. § 1981 by subjecting him to a hostile work environment because of his race, ethnicity, and/or ancestral characteristics and by creating and tolerating a hostile work environment.

195.    The offensive race and ethnic-based hostile work environment described in the preceding paragraphs was sufficiently severe or pervasive to alter the terms and conditions of employment for Plaintiff.

196.    The hostile work environment to which Plaintiff was subjected was perpetrated by Defendants' agents with direct supervisory authority over Plaintiff and occurred on a frequent and routine basis over a substantial period of time.

---

[3] While 42 U.S.C. § 1981 may not protect individuals from discrimination based on national origin, the Supreme Court has held that individuals "who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics" are protected from such discrimination under Section 1981. *Saint Francis Coll. V. Al-Khazraji*, 481 U.S. 604, 613 (1987). Various circuits have applied Section 1981 to plaintiffs of Pakistani birth. *See Zaidi v. Amerada Hess Corp*. 723 F.Supp.2d 506, 517 (E.D.N.Y 2010), *Shamim v. Siemens Indus., Inc*. 854 F.Supp.2d 496, 509 (N.D.Ill. 2012).

197. Defendants knew or should have known of the race and ethnic-based discrimination and hostile work environment because Plaintiff's supervisor and other managers created it, because the harassment was frequent and notorious in nature, and because Plaintiff complained about it.

198. Defendants failed to take prompt or effective action to prevent, correct, or remedy the discrimination and hostile work environment experienced by Plaintiff.

199. These acts or omissions by Defendants caused the hostile work environment experienced by Plaintiff.

200. Plaintiff was additionally subjected to disparate and adverse treatment, including different terms and conditions as described above and termination because of his race, ancestry, ethnicity, and/or ancestral characteristics.

201. The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities, otherwise adversely affect his status as an employee, deprive him of his right to make and enforce contracts, and deprive him of the full and equal benefit of laws, because of his protected characteristics.

202. The unlawful employment practices complained of above were intentional.

203. The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Plaintiff.

204. The employment practices of Defendants and their agents, supervisors, and employees directly and proximately resulted in such damages as may be proven at trial, including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and

26

degradation; and pain and suffering.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1981**
**Retaliation**
**(Against All Defendants)**

205.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

206.    Defendants retaliated against Plaintiff in violation of 42 U.S.C. § 1981.

207.    Plaintiff engaged in protected activity by opposing what he reasonably believed was unlawful discriminatory employment practices prohibited by 42 U.S.C. § 1981 by reporting the unlawful and discriminatory practices of Defendant Meakim and Lehnerer.

208.    Specifically, Plaintiff filed a complaint with YSS CEO Dirk Wallinger, YSS Vice President Angelina Smith, Human Resources Director Marie Lehnerer, and with the EEOC.

209.    Plaintiff's opposition and complaints were protected activity within the meaning of Section 1981.

210.    Defendant intentionally and unlawfully retaliated against Plaintiff for opposing the discrimination by subjecting Plaintiff to further harassment and ultimately terminating his employment.

211.    But for Plaintiff's opposition to harassment and protected complaints of discrimination, he would not have been subjected to the unlawful employment practices complained of above.

212.    The effect of the practices complained of in the forgoing paragraphs has been to deprive Plaintiff of the enjoyment of the benefits of employment and has otherwise adversely affected his status as an employee in violation of 42 U.S.C. § 1981.

27

213. The unlawful practices described above were intentional.

214. The unlawful employment practices complained of above were done with malice or with reckless indifference to Plaintiff's federally protected rights.

215. The retaliatory practices of Defendant and its agents, supervisors, and employees directly and proximately resulted in such damages as may be proven at trial, including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; and pain and suffering.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 2000e,** *et. seq.*
**Discrimination and Unlawful Hostile Work Environment Based on Race and National Origin**
**(Against Defendant YSS)**

216. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

217. Plaintiff is of Pakistani national origin and racially classified as Asian.

218. Plaintiff's race and national origin are protected classes under Title VII.

219. Defendant YSS discriminated against Plaintiff in violation of Title VII based on his race and national origin.

220. Defendant by and through the conduct of its employees and agents unlawfully denied Plaintiff the benefits, privileges, and terms and conditions of his employment due to his race and national origin.

221. Defendant additionally discriminated against Plaintiff in violation of Title VII by subjecting him to a hostile work environment because of his race and national origin and by creating and tolerating a hostile work environment.

28

222. The offensive race and national origin-based hostile work environment described in the preceding paragraphs was sufficiently severe or pervasive to alter the terms and conditions of employment for Plaintiff.

223. The hostile work environment to which Plaintiff was subjected was perpetrated by Defendant's agents with direct supervisory authority over Plaintiff and occurred on a frequent and routine basis over a substantial period of time.

224. Defendant knew or should have known of the race and national origin-based discrimination and hostile work environment because Plaintiff's supervisor and other managers created it, because the harassment was frequent and notorious in nature, and because Plaintiff complained about it.

225. Defendant Lehnerer, a decisionmaker at YSS, also engaged in race and national origin discrimination against Mr. Mohammad.

226. Defendant failed to take prompt or effective action to prevent, correct, or remedy the discrimination and hostile work environment experienced by Plaintiff.

227. These acts or omissions by Defendant caused the hostile work environment experienced by Plaintiff.

228. Plaintiff was additionally subjected to disparate and adverse treatment, including different terms and conditions as described above and termination because of his race and national origin.

229. The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities, otherwise adversely affect his status as an employee, deprive him of his right to make and enforce contracts, and deprive him of the full and equal

benefit of laws, because of his protected characteristics.

230.     The unlawful employment practices complained of above were intentional.

231.     The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Plaintiff.

232.     The discriminatory practices of Defendants and its agents, supervisors, and employees directly and proximately resulted in such damages as may be proven at trial, including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; and pain and suffering.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 2000e *et seq*.**
**Retaliation**
**(Against Defendant YSS)**

233.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

234.     Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], 42 U.S.C. § 2000e-3(a)] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

235.     Plaintiff opposed the discrimination that he reasonably believed was unlawful under Title VII.

236.     Plaintiff reported the discrimination he experienced to Defendant and believed he had filed a charge with the EEOC.

237.    Defendant intentionally and unlawfully retaliated against Plaintiff for opposing the discrimination by terminating his employment.

238.    But for Plaintiff's protected opposition to harassment and complaints of discrimination and hostile work environment he would not have been subjected to the unlawful employment practices complained of above.

239.    But for Plaintiff advising Defendant that he had filed a charge with the EEOC, he would not have been subjected to the unlawful employment practices complained of above.

240.    The effect of the practices complained of in the forgoing paragraphs has been to deprive Plaintiff of the enjoyment of the benefits of employment and has otherwise adversely affected his status as an employee in violation of Title VII.

241.    The unlawful practices described above were intentional.

242.    The unlawful employment practices complained of above were done with malice or with reckless indifference to Plaintiff's federally protected rights.

243.    The retaliatory practices of Defendant and its agents, supervisors, and employees directly and proximately resulted in such damages as may be proven at trial, including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; and pain and suffering.

**FIFTH CLAIM FOR RELIEF**
**Colorado Anti-Discrimination Act, C.R.S. § 24-34-401, *et. seq*.**
**Discrimination and Unlawful Hostile Work Environment**
**(Against Defendant YSS)**

244.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

245.    Defendant discriminated against Plaintiff in violation of C.R.S. § 24-34-402 on the

basis of his race, national origin, and ancestry.

246. Defendant by and through the conduct of its employees and agents unlawfully denied Plaintiff the benefits, privileges, and terms and conditions of his employment due to his race, national origin, and ancestry.

247. Defendant additionally discriminated against Plaintiff in violation of C.R.S. § 24-34-402 by subjecting him to a hostile work environment because of his race, national origin, and ancestry by creating and tolerating a hostile work environment.

248. The offensive race, national origin, and ancestry-based hostile work environment described in the preceding paragraphs was sufficiently severe or pervasive to alter the terms and conditions of employment for Plaintiff.

249. The hostile work environment to which Plaintiff was subjected was perpetrated by Defendant's agents with direct supervisory authority over Plaintiff and occurred on a frequent and routine basis over a substantial period of time.

250. Defendant knew or should have known of the race, national origin and ancestry-based discrimination and hostile work environment because Plaintiff's supervisor and other managers created it, because the discrimination and harassment was frequent and notorious in nature, and because Plaintiff complained about it.

251. Defendant failed to take prompt or effective action to prevent, correct, or remedy the discrimination and hostile work environment experienced by Plaintiff.

252. These acts or omissions by Defendant caused the hostile work environment experienced by Plaintiff.

253. Plaintiff was additionally subjected to disparate and adverse treatment,

including different terms and conditions as described above and termination because of his race, national origin, and ancestry.

254. The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities, otherwise adversely affect his status as an employee, deprive him of his right to make and enforce contracts, and deprive him of the full and equal benefit of laws, because of his protected characteristics.

255. The unlawful employment practices complained of above were intentional.

256. The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Plaintiff.

257. The employment practices of Defendant and its agents, supervisors, and employees directly and proximately resulted in such damages as may be proven at trial, including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; and pain and suffering.

**SIXTH CLAIM FOR RELIEF**
**Colorado Anti-Discrimination Act, C.R.S. § 24-34-401 *et. seq*.**
**Retaliation**
**(Against Defendant YSS)**

258. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

259. The Colorado Anti-Discrimination Act, C.R.S. § 24-34-402, makes it unlawful to attempt to commit any act defined as unlawful by the Act and to discriminate against any such person because that person "opposed any practice made a discriminatory or an unfair employment practice… [or] because he has filed a charge with the commission, or because

33

he has testified, assisted, or participated in any manner in an investigation."

260.    Plaintiff engaged in protected activities, including, but not limited to, opposing harassment and complaining about discrimination and harassment as described above.

261.    Plaintiff engaged in protected activities, including, but not limited to filing a complaint with CEO Dirk Wallinger, VP Angelina Smith, HR Director Marie Lehnerer and what he believed was a charge with the EEOC.

262.    As a result of Plaintiff's protected activity, Defendants subjected Plaintiff to a retaliatory hostile work environment.

263.    As a result of Plaintiff's protected activity, Defendant ended Plaintiff's employment.

264.    Defendant's actions were meant to dissuade a reasonable employee from making complaints or supporting a charge of discrimination.

265.    Defendants Lehnerer and Meakim orchestrated a retaliatory hostile work environment against Plaintiff.

266.    Defendant YSS knew about the harassment and acquiesced it in such a manner as to condone and encourage the actions.

267.    A causal connection exists between Plaintiff's engagement in protected activity and the adverse employment actions taken thereafter, up to and including termination.

268.    Defendant's conduct described herein was done with malice or recklessness and with disregard of Plaintiff's state protected rights.

269.    The employment practices of Defendant and its agents, supervisors, and employees directly and proximately resulted in such damages as may be proven at trial,

including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; and pain and suffering.

**SEVENTH CLAIM FOR RELIEF**
**42 U.S.C. § 12101 *et seq.***
**Disability Discrimination in Violation of ADA**
**(Against Defendant YSS)**

270.    Plaintiff hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

271.    Plaintiff has a physical disability as defined by law.

272.    At all relevant times, Plaintiff was qualified for his position.

273.    At all relevant times, Defendant knew of Plaintiff's physical disability.

274.    Defendant engaged in unlawful employment practices in the State of Colorado, in violation of Section 102 of the ADA, as amended, 42 U.S.C. § 12112.

275.    Defendant harassed Plaintiff due to his disability, making unlawful comments about his disability, blaming his disability for the other harassment he suffered, and forcing him to engage in unnecessary and unlawful medical examinations to retain his job.

276.    Defendant accused Plaintiff for having a difficult time with his employment due to his disability rather than the discrimination imposed on him by his manager, Defendant Meakim.

277.    The effect of the practices complained of in the forgoing paragraphs has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his disability.

35

278.    The unlawful employment practices complained of in the forgoing paragraphs were intentional.

279.    The unlawful employment practices complained of in the foregoing paragraphs were done with malice or with reckless indifference to the federally protected rights of Plaintiff.

280.     The discriminatory practices of Defendants and their agents, supervisors, and employees directly and proximately resulted in such damages as may be proven at trial, including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; and pain and suffering.

**EIGHTH CLAIM FOR RELIEF**
**C.R.S. § 24-34-401 *et. seq*.**
**Disability Discrimination in Violation of CADA**
**(Against Defendant YSS)**

281.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

282.    Under CADA, disability has the same meaning as set forth under the federal ADA. C.R.S. § 24-34-301.

283.    Plaintiff has a physical disability as defined by law.

284.    At all relevant times, Plaintiff was qualified for his position.

285.    At all relevant times, Defendant knew of Plaintiff's physical disability.

286.    Defendant harassed Plaintiff due to his disability, making unlawful comments about his disability, blaming his disability for the other harassment he suffered, and forcing him to engage in unnecessary and unlawful medical examinations to retain his job.

36

287.    Defendant accused Plaintiff of having a difficult time with his employment due to his disability rather than the discrimination imposed on him by his manager, Defendant Meakim.

288.    Although such harassment was severe or pervasive, harassment need not arise to the level of severe or pervasive to be actionable under state law.

289.    The effect of the practices complained of in the forgoing paragraphs has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his disability.

290.    The unlawful employment practices complained of in the forgoing paragraphs were intentional.

291.    The unlawful employment practices complained of in the foregoing paragraphs were done with malice or with reckless indifference to the state protected rights of Plaintiff.

292.    The discriminatory practices of Defendants and their agents, supervisors, and employees directly and proximately resulted in such damages as may be proven at trial, including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; and pain and suffering.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against each of the Defendants, and award them all relief allowed by law, including but not limited to the following:

37

A.    All appropriate relief at law and equity;

B.    Declaratory relief and other appropriate equitable relief;

C.    Economic losses on all claims as allowed by law;

D.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

E.    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

F.    Attorneys' fees and the costs on all claims allowed by law;

G.    Pre-and post-judgment interest at the lawful rate;

I.    A tax-offset; and,

Any other appropriate relief at law and equity that this court deems just and proper.

**PLAINTIFF HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED: August 14, 2024

RATHOD | MOHAMEDBHAI LLC

*s/ Azra Taslimi*
Azra Taslimi
Iris Halpern
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400 (t)
(303) 578-4401 (f)
at@rmlawyers.com
ih@rmlawyers.com
ATTORNEYS FOR PLAINTIFF